**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
───────────────────────────────────────────

**BETH K. WILSON,**

                                        **Plaintiff,**

            **vs.**                                        **8:15-CV-752**
                                                           **(MAD/CFH)**

**AETNA LIFE INSURANCE COMPANY, THE**
**BUSINESS COUNCIL OF NEW YORK STATE,**
**INC., and TRUSTEES OF THE BUSINESS**
**COUNCIL OF NEW YORK STATE, INC.**
**INSURANCE FUND,**

                                        **Defendants.**
───────────────────────────────────────────

**APPEARANCES:**                              **OF COUNSEL:**

**ANDERSON, MOSCHETTI &**                     **PETER J. MOSCHETTI, JR., ESQ.**
**TAFFANY LAW**
26 Century Hill Drive
Suite 206
Latham, New York 12110
Attorneys for Plaintiff

**EPSTEIN, BECKER & GREEN, P.C.**             **KENNETH J. KELLY, ESQ.**
250 Park Avenue                               **SCARLETT L. FREEMAN, ESQ.**
New York, New York 10177-0077
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

        Plaintiff commenced this action on May 29, 2015 in Clinton County Supreme Court,

alleging breach of contract.  *See* Dkt. Nos. 1 & 2.  Specifically, Plaintiff's complaint seeks

recovery of the sum of $50,000, plus interest, representing Accidental Death and Personal Loss

benefits under an employee benefits plan sponsored by the Business Council of New York State

("BCNYS") and funded by a life insurance policy issued by Aetna Life Insurance Company ("Aetna"). *See id.* On June 18, 2015, Defendants removed the action to this Court. *See id.*

Currently before the Court are the parties' cross-motions for summary judgment.

## II. BACKGROUND

Plaintiff Beth K. Wilson is the mother of James D. Wilson ("Decedent"), who died on June 20, 2012, after his motorcycle collided with another car. *See* Dkt. No. 14 at ¶ 1. BCNYS is a not-for-profit professional organization that sponsors a program of employee benefits for its member companies, which included Decedent's former employer, Jeffords Steel and Engineering Company. *See id.* at ¶ 2. Through his former employer, Decedent participated in the Benefit Plan established by the Trustees (the "Plan"). *See id.*

The Plan is an employee welfare benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(3). *See id.* at ¶ 3. Accidental Death and Personal Loss Coverage ("ADPL") benefits under the Plan are funded by the policy of group life insurance issued by Aetna to the Trustees. *See id.* at ¶ 4. Aetna is the claims administrator for the Plan. *See id.* at ¶ 5.

James Wilson named Plaintiff as the sole beneficiary of the ADPL policy. *See* Dkt. No. 18-9 at ¶ 3. At the time of his death, the Decedent was enrolled for $50,000 in basic life insurance benefits and $50,000 in ADPL benefits. *See* Dkt. No. 14 at ¶ 10.

On July 2, 2012, Plaintiff submitted a claim for life and ADPL benefits to BCNYS, which forwarded it to Aetna. *See id.* at ¶ 11. Plaintiff's claim included Decedent's Proof of Death claim form, dated June 21, 2012, and Decedent's Certificate of Death, issued June 22, 2012. *See id.* Decedent's Certificate of Death reflects that he died from "Multiple Blunt Force Injuries" which occurred in a "Motorcycle Accident." *Id.* at ¶ 12.

2

Aetna paid Plaintiff $50,004.78, which includes interest, as the life insurance death benefit. *See id.* at ¶ 13. By letter dated July 12, 2012, Aetna informed Plaintiff that in order to perform a thorough review of her ADPL claim, it required the following information: (1) police department final investigation report/Incident report/Witness statements; (2) Coroner's/Medical Examiner's report; (3) Final autopsy report; and (4) Toxicology laboratory results for the date of the incident. *See id.* at ¶ 14. To enable it to secure the required documents, Aetna sent Plaintiff an authorization for release of information. *See id.* Plaintiff completed the authorization on July 24, 2012 and returned it to Aetna. *See id.* at ¶ 15.

By letter dated August 27, 2012, Aetna faxed the authorization to the Clinton County Coroner's Office requesting the coroner's report, autopsy report, and toxicology report from Decedent's crash. *See id.* at ¶ 16. Aetna mailed another request to the Clinton County Coroner's Office on September 17, 2012. *See id.*

By letters dated January 17, March 4, March 27, April 23, May 20, and June 14, 2013, Aetna advised Plaintiff that it was unable to review Plaintiff's claim because it had still not received the police report. *See* Dkt. No. 14 at ¶ 17. On or about February 14, 2013, Aetna received the autopsy and toxicology reports from the Clinton County Coroner's Office. *See id.* at ¶ 18. According to the NMS Labs toxicology report dated June 29, 2012, Decedent had a blood alcohol concentration of 0.246 g/100mL. *See id.* at ¶ 20. The autopsy reported, dated July 20, 2012, described the injuries that caused Decedent's death as follows:

> Mr. James Wilson, a 26 year old male, was the operator of a motorcycle that was traveling at a high rate of speed when it collided with a vehicle that was attempting to make a U-turn. Mr. Wilson sustained multiple severe injuries, including comminuted skull fractures, multiple fractures of the bilateral ribs and upper and lower extremities and a laceration of the left heart. Toxicology tests were positive for Ethanol (blood) 246 mg/dL (Blood Alcohol Concentration 0.246 g/100 mL).

*Id.* at ¶ 21.

On or about July 23, 2013, Aetna received the police report. *See id.* at ¶ 22. The report documentation included an incident report, two witness statements, three property receipts, a police toxicology report, a report of incident verification, a collision reconstruction report, and police reports. *See id.* The collision reconstruction report submitted by New York State Trooper Thomas S. Houle and peer reviewed by State Police Investigator Michael P. Campbell, described the incident as follows:

> The collision was reported to have occurred on State Route 9 in the Town of Chazy, Clinton County, New York, at approximately 8:11 p.m [on June 20,2012. ...
>
> [A] northbound Subaru Legacy [Vehicle One] was completing a u-turn in the roadway when it was struck in a right angle collision by a northbound Honda motorcycle [Vehicle Two]. . . The operator of the Honda [Decedent] was ejected from the motorcycle and sustained fatal injuries as a result of the collision.
>
> \* \* \* \* \*
>
> State Route 9 is an unlit two lane, two way, individual roadway constructed of asphalt, which measures approximately 30 feet in width. . . The roadway was straight at the area of impact with a normal crown. ' . . . The speed limit was posted at 55 miles per hour. The temperature was approximately 86 degrees and the roadway was dry. It was dusk at the time of the collision with the sun setting at approximately 8:31 p.m.
>
> \* \* \* \* \*
>
> Factoring in angles of approach and departure for both Vehicle One and Vehicle Two, [Decedent's motorcycle's] speed was calculated to be a minimum of 124 mph, a conservative speed estimate. Vehicle One's speed was calculated to be 9 miles per hour.
>
> \* \* \* \* \*
>
> No roadway defects, view obstructions, line of sight limitations/obstructions or animal actions were observed that would have contributed to this collision.

4

> The primary cause of this collision is shared by the operators of
> Vehicle One and Vehicle Two. . . [T]he operator of Vehicle One,
> failed to yield the right of way to Vehicle Two.  Conversely, James
> D. Wilson, the operator of Vehicle Two, was traveling at a
> recklessly high speed.

Dkt. No. 14 at ¶ 23; *see also* Dkt. No. 13-10 at 21-22, 26, 30.

Steven M. Monty, an eye witness, provided a statement to police at 8:45 p.m., shortly

following the accident.  *See* Dkt. No. 13-10 at 12.  Specifically, Mr. Monty stated as follows:

> Just before the accident occurred, I was outside my parent's
> residence. . . .  From that location, I have a clear view of SR-9.  I
> was working on the air conditioning when I heard a motorcycle
> really get on the throttle.  It was more than I had ever heard, and I
> could tell he was really moving fast.  This is why I turned around to
> see it.  When I turned around, I saw the motorcycle was really
> going, northbound on SR-9.  Just north of him, a car was in the
> process of a U-turn.  The motorcycle just slammed right into the
> car.  I don't even think he hit his brakes he was moving so fast.

*Id.*  At 9:15 p.m. that same evening, another eye witness, Steven M. Stone, stated that he was with

Mr. Monty when he "heard a motorcycle coming north on Route 9.  We both turned around to see

a motorcycle northbound at a high rate of speed, he was flying.  I then saw the motorcycle hit the

side of [the] car which was across the roadway.  It was a very loud impact."  *Id.* at 13.

By letter dated July 24, 2013, Aetna denied Plaintiff's claim for ADPL, stating in part as

follows:

> Our review of this ADPL claim has determined that Mr. Wilson's
> death was caused or contributed to by his operation of a motorcycle
> at a high rate of speed while under the influence of alcohol over the
> legal limit, an intentionally self-inflicted injury.  An accident is an
> event which happens by chance or fortuitously, which is unexpected
> and unforeseen.  In this situation, Mr. Wilson should have foreseen
> the consequences of his action.
>
> Due to his voluntary actions, Mr. Wilson exposed himself to
> unnecessary risks.  These risks were reasonably foreseeable, and

> such that he should have known or appreciated the consequences of his intentional acts, including the likelihood or strong possibility of death. It is not an unforeseen consequence that death would occur under these circumstances.
>
> Based on the information we have been provided with and in accordance with the requirements of the Policy, it has been determined that Mr. Wilson's death was caused or contributed to by an intentionally self-inflicted injury which is a losses [sic] excluded by the Policy. Therefore, we must respectfully deny this request for ADPL benefits in the amount of $50,000.00.

Dkt. No. 13-11 at 4. Aetna also advised Plaintiff of her right to appeal the decision within sixty days, pursuant to the Plan, and to bring a civil action under Section 502(a) of ERISA. *See id.*

By letter dated August 1, 2014, Plaintiff's then-counsel requested review of Aetna's denial of the ADPL benefits. *See* Dkt. No. 13-12 at 2-3. In the letter, Plaintiff claimed that, "[w]hile, according to the police report, James Wilson was proceeding in an unsafe speed; the operator of the vehicle involved in the collision turned improperly by making an improper U-turn and said improper turn was determined to be an apparent contributing factor in causing the collision." *Id.* at 3. On August 18, 2014, Aetna denied Plaintiff's request for review based on the fact that the request was submitted more than sixty days after the July 24, 2013 decision. *See* Dkt. No. 13-13 at 2-3.

Plaintiff commenced this action in New York Supreme Court, Clinton County, by Summons and Complaint dated May 29, 2015. *See* Dkt. No. 2. On June 18, 2015, Defendants removed the action to this Court. *See* Dkt. No. 1. Currently before the Court are the parties' cross-motions for summary judgment. *See* Dkt. Nos. 12 & 18.

### III. DISCUSSION

**A.      Summary judgment standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.     The parties' motions**

In their motion for summary judgment, Defendants contend that Aetna reasonably concluded that the Decedent was not killed by an "accident" but deliberately operated a motorcycle at excessive speed while drunk and, thereby, caused his death. *See* Dkt. No. 15 at 7. Further, since the Policy expressly grants full discretionary authority to Aetna to construe the

terms of the Plan and to make coverage and benefits determinations, Defendants argue that the Court must evaluate Aetna's decision under the arbitrary and capricious standard. *See id.* Further, Defendants assert that their interpretation of the term "accident" in the Plan was not arbitrary and capricious. *See id.* at 8-9. Moreover, Defendants contend that their decision was supported by substantial evidence in the administrative record. *See id.* at 10-12. Defendants also argue that Aetna's denial of ERISA benefits was supported by the weight of federal case law. *See id.* at 12-16. Defendants further contend that the separate ADPL exclusion for "use of narcotics or intoxicants" is equally applicable to preclude Plaintiff's claim for benefits. *See id.* at 16-17. Finally, Defendants contend that Defendant BCNYS should be dismissed from this action because, as the sponsor of the Plan, BCNYS is not a proper party defendant. *See id.* at 17 (citing *Brannon v. Tarlov*, 986 F. Supp. 146, 152 (E.D.N.Y. 1997), *aff'd* 164 F.3d 617 (2d Cir. 1998)).

In her response and cross-motion, Plaintiff first argues that the Court should review Aetna's denial of ADPL benefits under the *de novo* standard of review. *See* Dkt. No. 18-10 at 6-9. While Plaintiff admits that the Policy grants discretionary authority to Aetna, she contends that *de novo* review is appropriate because Aetna failed to comply with ERISA claims regulations. *See id.* at 6-7 (citing *Nichols v. Prudential Ins. Co.*, 406 F.3d 98 (2d Cir. 2005)). Plaintiff claims that, although Aetna eventually denied Plaintiff's claim, it did so substantially outside the time period permitted by both the Plan and the applicable regulations. *See id.* at 7-8. As such, Plaintiff claims that the deferential arbitrary and capricious standard is inapplicable. *See id.* at 8.

Next, Plaintiff argues that, regardless of the standard applied by the Court, Aetna's denial of Plaintiff's claim was improper. *See id.* at 9. Plaintiff contends that the Decedent's death was not the result of an "intentionally self-inflicted injury," as Aetna determined in denying her claim. *See id.* Plaintiff asserts that the Plan does not define the term "accident" with any specificity and

provides no definition of the term "intentionally self-inflicted injury." *Id.* at 11. Plaintiff argues that the ambiguity of these terms must be resolved in her favor. *See id.* Citing cases that she claims are factually similar, Plaintiff contends that the case law and evidence in this case direct that the Decedent's death was an "accident" and, therefore, not excluded under the Policy. *See id.* at 12-16. Finally, Plaintiff asserts that Defendants waived their right to rely upon the "use of narcotics or intoxicants" exclusion under the Policy as a basis for denying ADPL benefits. *See id.* at 16-17.

**C.    Standards of review applicable to ERISA actions**

When considering an ERISA claim alleging improper denial of benefits, the Court must first determine the appropriate standard of review to conduct its analysis of the ERISA plan administrator's decision to deny benefits. In general, a *de novo* standard of review will apply to the plan administrator's determination, unless the plan grants authority to the administrator to use his or her discretion to construe the terms of the plan and determine eligibility for plan benefits. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In *Firestone*, the Supreme Court held that "a denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan." *Id.*

Under a *de novo* standard of review "the Court will review 'all aspects of [the] administrator's eligibility determination, including fact issues, *de novo*.'" *O'Hara v. National Union Fire Ins. Co. of Pittsburgh, PA*, 697 F. Supp. 2d 474, 476 (W.D.N.Y. 2010) (quotation omitted). When a court engages in *de novo* review, plan terms are "given their plain meanings," *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1084 (1st Cir. 1990), and ambiguities in plan language are to be construed in favor of the claimant, *see Masella v. Blue Cross & Blue*

*Shield of Conn., Inc.*, 936 F.2d 98, 107 (2d Cir. 1991) (citations omitted); *see also Rudolph v. Joint Industry Bd. of Elec. Industry*, 137 F. Supp. 2d 291, 300 (S.D.N.Y. 2001) (citation omitted). Under a *de novo* standard of review, no deference is given to the plan administrator's interpretation of the plan. *See Katzenberg v. First Fortis Life Ins. Co.*, 500 F. Supp. 2d 177, 193-94 (E.D.N.Y. 2007) (citation omitted). Indeed, "the fiduciary must show that the claimant's interpretation is unreasonable and that its own interpretation is the only one that could fairly be placed on the policy." *Rudolph*, 137 F. Supp. 2d at 300 (citing *Alfin, Inc., v. Pacific Ins. Co.*, 735 F. Supp. 115, 119 (S.D.N.Y. 1990)).

If a benefits plan grants the plan administrator discretionary authority to determine eligibility for benefits, however, an arbitrary and capricious standard of review will be applied to the administrator's determination. *See Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249-52 (2d Cir. 1999). Under the arbitrary and capricious standard, a denial of benefits "may be overturned only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Id.* at 249 (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)) (other citation omitted); *see also Fuller v. J.P. Morgan Chase & Co.*, 423 F.3d 104, 107 (2d Cir. 2005). To establish that a plan administrator's decision is supported by "substantial evidence," the decision must be supported by "'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator.]'" *Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quotation omitted). There must be more than a "'scintilla'" of evidence to support the decision, but there need not be a preponderance of the evidence, provided the evidence relied upon by the administrator is reliable. *See id.* (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).

In the present matter, Plaintiff contends that the Court must engage in *de novo* review because "the Second Circuit has held that in certain circumstances a plan's administrator's failure to comply with ERISA claims regulations requires courts to eschew the more defferential [sic] arbitrary and capricious review in favor of more searching *de novo* review." Dkt. No. 18-10 at 6-7. Specifically, Plaintiff contends that, notwithstanding the Plan's grant of discretionary authority, *de novo* review should apply because Aetna's initial determination fell outside the deadlines prescribed by 29 C.F.R. § 2560.503-1(f)(1).

Plaintiff relies heavily on *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 109 (2d Cir. 2005), in which the Second Circuit announced an exception to *Firestone*'s deferential review standard for cases in which the plan administrator has discretion, but fails to exercise it. Distilled to its essence, Plaintiff's position is that because Aetna did not render a decision within the mandated timeframe, *Nichols* requires that *de novo* review be applied, and no exceptions to that requirement are warranted.

Defendants, however, note that *Nichols* was decided under superceded ERISA regulations addressing the situation where the plan administrator fails to issue any final determination until after the plaintiff commenced a lawsuit. *See* Dkt. No. 19 at 2. Further, Defendants contend that courts have generally limited *Nichols'* application to those cases in which the administrator fails entirely to issue a decision, which is not the case in the present matter. *See id.* (quoting *Delprado v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 1:12-cv-00673 (BKS/RFT), 2015 U.S. Dist. LEXIS 51263, at *66 (N.D.N.Y. Apr. 20, 2015)). Further, Defendants argue that the Court should decline to follow other authority cited by Plaintiff, including *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 799 (10th Cir. 2010). *See* Dkt. No. 19 at 4. In *LaAsmar*, the Tenth Circuit refused to apply what it called a "'hair-trigger rule'" requiring a *de novo* standard of review based

on the plan's failure to comply with the procedures in the ERISA regulation. *LaAsmar*, 605 F.3d at 799 (quotation omitted). Instead, the court found that an administrator's decision is entitled to deferential review so long as the decision was in "substantial compliance" with the relevant regulation. *See id.* (citation omitted).

On April 12, 2016, after the pending motion was fully briefed, the Second Circuit decided *Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016). In *Halo*, the plaintiff was a student at Yale University and was insured under the Yale Health Plan. *See id.* at 46. When the plaintiff began experiencing serious problems with her left eye, she visited and underwent surgery with doctors within the Yale Health Plan network. *See id.* Dissatisfied with the results of her treatment, she returned to her parents' home, where she eventually underwent further surgery with doctors who were not in the Plan's network, and whose treatment therefore was covered only if the condition treated constituted an emergency or urgent condition or if the treatment was approved in advance by the Plan's Care Coordination Department. *See id.*

The Plan ultimately rejected the plaintiff's claims for coverage for the treatment. *See id.* Appearing *pro se*, the plaintiff filed a civil action against the Plan alleging, among other things, that it violated the Department of Labor's claims-procedure regulation when it denied a number of her claims for benefits. *See id.* Specifically, the plaintiff contested both the timing and content of the explanations concerning the denials. For example, the regulations require that notification of an adverse benefit determination set forth a number of specific pieces of information, including the following: (1) the specific reason(s) for the adverse determination; (2) reference to the specific plan provisions on which the determination is based; (3) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) a description of the plan's review procedures

and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action following an adverse benefit determination on review. *See id.* (quoting 29 C.F.R. §§ 2560.503-1(g)(i)-(iv)). Despite these requirements, in the plaintiff's case, at least one of the denials merely stated that the "service was not authorized." *Id.*

In determining whether the Plan remained entitled to the discretionary standard of review, the district court applied a "substantial compliance" standard. *Id.* (citing *Halo v. Yale Health Plan (Halo II)*, 49 F. Supp. 3d 240, 244-53 (D. Conn. 2014)). That is, the district court concluded that, when exercising discretionary authority to deny a claim for benefits, a plan's failure to establish or follow a reasonable claims procedure in accordance with the regulations entitles the claimant to *de novo* review unless the plan "substantially complied" with the regulations. *Id.* The district court explained that a plan substantially complies with the regulations if the administrator made efforts to keep the beneficiary apprised of the claim assessment process and delivered reasonably timely and detailed decisions, which indicate that the administrator validly exercised its discretion. *See id.* Applying the substantial-compliance doctrine, the district court concluded that, while the Plan's communications of its denials were not ideal, and in some instances failed to comply with ERISA regulations, the substance and timing of the denials were in fact sufficient to indicate that the Plan had exercised its discretion. *See id.* The district court therefore reviewed the Plan's denials under an arbitrary and capricious standard. *See id.* The court went on to hold that civil penalties are available to a claimant if a plan fails to substantially comply with the regulations. *See id.*

On appeal, the Second Circuit held that the district court applied the incorrect standard. *See Halo*, 819 F.3d at 45. Specifically, the Second Circuit held that, "when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation,

29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the regulation in the processing of a particular claim was inadvertent *and* harmless." *Id.* (emphasis in original). Finally, the Circuit held that "a plan's failure to comply with the claims-procedure regulation may, in the district court's discretion, constitute good cause warranting the introduction of additional evidence outside the administrative record." *Id.* In light of its holdings, the Circuit remanded the case to the district court for further proceedings. *See id.* at 45-46.

In reaching this holding, the Second Circuit relied in part on the fact that, under the new regulations, the Department added a subsection addressing the consequences for "[f]ailing to establish and follow reasonable claims procedures," which provides:

> "In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim."

*Id.* at 53 (quoting 29 C.F.R. § 2560.503-1(l)). The preamble to the regulation explained that this subsection was included to ensure that a "'decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference.'" *Id.* (quoting 65 Fed. Reg. at 70,255) (emphasis omitted). "In other words, a plan's failure to establish or follow the claims-procedure regulation entitles the claimant to have his or her claim reviewed *de novo* in federal court." *Id.*

The Second Circuit also noted that, in *Firestone*, "the Supreme Court held that courts should defer to an administrator's discretionary decision, but this holding is premised on there

14

being a decision to which a court may defer." *Halo*, 819 F.3d at 54. " Interpreting *Firestone*, many courts applying the 1977 regulation concluded that deference is not warranted if the plan failed to make a decision in the first place." *Id.* (citing *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 107 (2d Cir. 2005) ("[W]e may give deferential review only to actual exercises of discretion"))) (other citations omitted). As such, the court found that the new language found in section 2560.503-1(l) "could be reasonably read as incorporating the logic of Firestone and its progeny that a claim is subject to de novo review if it is 'deemed denied,' the effective equivalent of being deemed exhausted under the 2000 regulation." *Id.* (citations omitted).

The Second Circuit rejected the so-called "substantial compliance" doctrine that other courts had adopted under the previous regulation, the court found that it is "flatly inconsistent" with 2000 regulation. *See id.* at 56 (citation omitted). Despite rejecting the "substantial compliance doctrine," the Second Circuit noted that the Department has indicated that "inadvertent and harmless deviations in the processing of a particular claim" will not necessarily deprive the plan from deferential review. *See id.* at 57. As such, the Court held that, although such deviations will "not be tolerated lightly," deferential review will apply if the plan has "otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless." *Id.* at 57-58.

In the present matter, the Court finds that Aetna has established that it is entitled to deferential review. First, the Court notes that in *Halo*, the plan's denials of coverage were not only repeatedly untimely, but also failed to provide an explanation as to why the plan was denying coverage. As such, it was impossible for the plaintiff and the reviewing court to determine the reason for the denial of coverage. Here, however, there was a single denial of

Plaintiff's claim that, while untimely, provided the specific reason for the denial and was otherwise in full conformity with the applicable regulations and the Plan.[1]  Moreover, Plaintiff admits that, upon receipt of the police report on July 23, 2013, Aetna denied her claim within one day.  Further, Plaintiff has not alleged that she was in any way harmed by the delay, nor could she.

Further, the Court finds that Plaintiff waived her ability to take advantage of 29 C.F.R. § 2560.503-1(l).  That provision would have permitted Plaintiff to immediately bring the present action upon the expiration of the initial ninety (90) day time limit because, when Aetna failed to issue a decision on her claim within that time, or to request an additional ninety (90) days to reach its decision, she would have been "deemed to have exhausted the administrative remedies available under the plan."  29 C.F.R. § 25650.503-1(l).  Plaintiff, who was represented by counsel, did not take advantage of this provision and instead waited until Aetna received all of the information needed to render its decision.  Having opted to forego taking advantage of this provision by bringing her claim prior to receiving the adverse decision, Plaintiff cannot now argue that Aetna is stripped of its deferential review simply because she does not agree with the decision it rendered.  *See Kurma v. Starmark, Inc.*, 160 F. Supp. 3d 420, 427 n.3 (D. Mass. 2016) (holding that procedural violations are analyzed on a case-by-case basis and noting that late notices of an adverse determination have "no connection to the substantive decision reached" and do not "call into question the integrity of the benefits-denial decision itself") (citation omitted);

---

[1] The Court also notes that *Halo* involved a health insurance plan and payment for medical costs; whereas the present matter involves the payment of Accidental Death and Personal Loss Coverage.  As such, the same concerns in providing prompt decisions regarding coverage are not necessarily applicable to the present matter.

*see also Beckuell v. Severance Pay Plan of Johnson & Johnson*, ___ Fed. Appx. ___, 2016 WL 1085527, *7 (3d Cir. 2016).

Based on the foregoing, the Court finds that Defendants are entitled to review under the arbitrary and capricious standard. As discussed below, however, under either standard, Plaintiff is not entitled to the claimed ADPL benefits.

## D. Aetna's Determination was not Arbitrary and Capricious

In denying Plaintiff's claim, Aetna included the language of the Policy upon which it relied. Specifically, Aetna indicated that it was denying the claim based on the following exclusion: "Not all events which may be ruled accidental are covered by this plan. No benefits are payable for a loss caused or contributed to by . . . Intentionally self-inflicted injury." Dkt. No. 13-11 at 3. Further, according to the letter, the Glossary Section of the Policy provides the following definition of the term "accident":

> This means a sudden external trauma that is; unexpected; and unforeseen; and is an identifiable **occurrence** or event producing, at the time, objective symptoms of a[n] external bodily injury. The **accident** must occur while the person is covered under this Policy. The **occurrence** or event must be definite as to time and place. It must not be due to, or contributed by, an **illness** or disease of any kind including a reaction to a condition that manifests within the human body or a reaction to a drug or medication regardless of the reason you have consumed the drug or medication.

*Id.* (emphasis in original); *see also* Dkt. No. 13-2 at 20. Further, according to the Policy, "injury" is defined as "[a]n accidental bodily **injury** that is the sole and direct result of: . . . An unexpected or reasonably unforeseen occurrence or event; or . . . The reasonable unforeseeable consequences of a voluntary act by the person." Dkt. No. 13-2 at 21.

Courts reviewing the denial of accidental death benefits under the arbitrary and capricious standard have almost always found that the plan acted reasonably in determining that injuries

resulting from driving while intoxicated do not arise from an "accident." Some of these courts applied a "reasonably foreseeable" approach to uphold the administrative determination that a death resulting from driving while intoxicated, while not deliberately suicidal, is not "accidental" because the result was reasonably foreseeable. *See, e.g.*, *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1109-10 (7th Cir. 1998) (holding that it was not arbitrary or capricious for insurer to conclude that death from driving with a BAC of 0.252% was reasonably foreseeable); *Grose v. Sun Life Assur. Co. of Canada*, 568 F. Supp. 2d 652, 656 (W.D. Va. 2008) (holding that the insurer reasonably concluded that the decedent, who voluntarily drove his motorcycle on the highway while intoxicated, was not in an "accident" for purposes of the policy); *Arnold ex rel. Hill v. Hartford Life Ins. Co.*, 542 F. Supp. 2d 471, 476-81 (W.D. Va. 2008) (holding that it was reasonable for insurer to conclude that death from driving with a BAC of 0.17% was foreseeable); *Sorrells v. Sun Life Assurance Co. of Canada*, 85 F. Supp. 2d 1221, 1232-36 (S.D. Ala. 2000) (holding that it was not arbitrary or capricious for insurer to conclude that death from driving with BAC of 0.23% was reasonably foreseeable); *Schultz v. Metro. Life Ins. Co.*, 994 F. Supp. 1419, 1422 (M.D. Fla. 1997) (holding that it was reasonable for the insurer to conclude that death from driving with a BAC of 0.29% was not accidental because decedent "knew, or should have known, that he was risking his life in a real and measurable way"); *Miller v. Auto-Alliance Int'l, Inc.*, 953 F. Supp. 172, 176-77 (S.D. Mich. 1997) (holding that it was not arbitrary or capricious for insurer to conclude that death from driving with BAC of 0.29% was not an "accident"). In these cases, the courts upheld the insurers' determinations that the deaths from drunk driving were not "accidental" because they were reasonably foreseeable, even where the plan at issue did not explicitly define the term "accident."

Similarly, courts applying the broader federal common law definition of "accident" have upheld denials of ERISA benefits in cases where the insured's death resulted from driving while intoxicated. *See Stamp v. Metro. Life Ins. Co.*, 531 F.3d 84, 88-94 (1st Cir. 2008) (concluding that the insurer's denial of benefits was not arbitrary and capricious because the circumstances of the case, including driving with a BAC of 0.265%, is highly likely to result in death); *Lennon v. Metro. Life Ins. Co.*, 504 F.3d 617, 620-24 (6th Cir. 2007) (holding that an insurer's denial of benefits was not arbitrary and capricious because driving with a BAC of 0.32% presented a reckless and unwarranted risk of death); *Eckelberry v. Reliastar Life Ins. Co.*, 469 F.3d 340, 345-48 (4th Cir. 2006) (concluding that insurer's determination that death from driving with a BAC of 0.15% was not "unexpected" was reasonable under test of reasonable foreseeability or high likelihood); *McGillivray v. Life Ins. Co. of N. Am.*,519 F. Supp. 2d 157, 167-69 (D. Mass. 2007) (holding that the insurer's denial of accidental death benefits was not arbitrary or capricious because driving with a BAC of 0.242% was highly likely to result in death); *Gilbert v. Estate of Cox*, No. 05-cv-283, 2007 WL 2023576, *3-*4 (E.D. Ky. July 10, 2007) (holding that the insurer's denial of benefits was rational because the decedent's death from driving with BAC of 0.246% was "highly likely to occur as a result of her intentional conduct"); *Weatherall v, ReliaStar Life Ins. Co.*,398 F. Supp. 2d 918, 923-24 (W.D. Wis. 2005) (concluding that the insurer's denial of accidental death benefits was reasonable because death from driving motorcycle with a BAC of 0.198% was "reasonably foreseeable . . . even if it was unintentional"); *Walker v. Metro. Life Ins. Co.*, 24 F. Supp. 2d 775, 779-82 (E.D. Mich. 1997) (finding that the insurer properly denied accidental death benefits because death from driving with a BAC of 0.22% was highly likely to occur).

In the present matter, regardless of the test applied, Aetna's denial of this claim under the provision at issue was not arbitrary and capricious. As noted, the Toxicology Report found that Decedent's BAC was 0.246%, which is more than three times the legal limit in New York. *See* Dkt. No. 13-11 at 3-4. Courts have taken "judicial notice of the fairly obvious scientific fact that as blood-alcohol levels rise, 'so does the risk of being involved in a fatal crash.'" *Lennon*, 504 F.3d at 623 (quoting Nat'l Hwy. Traffic Safety Admin., U.S. Dep't of Transp., Setting Limits, Saving Lives: The Case for 0.08 BAC Laws, DOT HS 809 241, Apr. 2001, at Sec. IV) (other citation omitted). Courts have also noted that "'[d]runk driving is a reckless act, perhaps an act of gross negligence. Any drunk driver who takes to the road should know he runs a risk of injuring another person [or himself]. The extent of the risk will of course vary from case to case, depending on how intoxicated the driver is, how far he drives, how fast he drives, and how many other drivers and pedestrians are sharing the road with him.'" *Lennon*, 504 F.3d at 621 (quoting *United States v. Rutherford*, 54 F.3d 370, 376 (7th Cir. 1995)) (other citation omitted).

In this case, the Decedent was extremely intoxicated, driving his motorcycle in excess of 124 miles per hour in a 55 miles per hour zone, at 8:11 p.m. (dusk). *See* Dkt. No. 13-10 at 22. Aetna considered these facts and circumstances in denying Plaintiff's claim and did not solely rely on the fact that the Decedent was extremely intoxicated as Plaintiff has suggested. *See Danouvong ex rel. Estate of Danouvong v. Life Ins. Co. of N. Am.*, 659 F. Supp. 2d 318, 327 (D. Conn. 2009) (citing *Demirovic v. Bldg. Serv. 32 B–J Pension Fund*, 467 F.3d 208, 216 (2d Cir. 2006); *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1108-09 (7th Cir. 1998)). Based on the foregoing, the Court finds that Aetna's determination that the Decedent's death was not "accidental" was reasonable and supported by substantial evidence. As such, the Court grants Defendants' motion for summary judgment and denies Plaintiff's cross motion.

**E.     Aetna's Determination Withstands *De Novo* Review**

In the alternative, the Court finds that, even if *de novo* review were required, Defendants are still entitled to summary judgment.

In *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246 (2d Cir. 2004), the Second Circuit held that "the developing federal common law used in ERISA cases to determine whether a death . . . was, within the meaning of an ERISA-regulated insurance policy, either accidental or the result of an intentionally self-inflicted injury," was reflected in "th[e] subjective/objective analysis" applied in *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125-26, 1129 (9th Cir. 2002), under which

> [t]he court first asks whether the insured subjectively lacked an expectation of death or injury.  If so, the court asks whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences.  If the subjective expectation of the insured cannot be ascertained, the court asks whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct.

*Critchlow*, 378 F.3d at 257-58 (quoting *Padfield*, 290 F.3d at 1126) (emphasis omitted); *see also Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077, 1088-89 (1st Cir. 1990) (first setting forth a subjective/objective analysis).

In the present matter, the Court is unable to ascertain the subjective expectation of Decedent.  As such, it must determine "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct.  *See id.*  The facts that the Court must consider are that, among other things, Decedent's BAC was 0.246% and he was driving his motorcycle in excess of 124 miles per hour in a 55 miles per hour zone, at 8:11 p.m. (dusk).  *See*

Dkt. No. 13-10 at 22.  Unlike the cases upon which Plaintiff relies, the Decedent was not only traveling at an extraordinarily high rate of speed, but he also had a BAC of more than three times the legal limit.  For example, Plaintiff relies on *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 326 (6th Cir. 2009) (2-1 decision).  In *Kovach*, the plaintiff's injuries required the amputation of his left leg below the knee.  The plan administrator denied the plaintiff's dismemberment claim after determining that his injuries were caused by his drunk driving (with a BAC of 0.148%), and, therefore, not accidental under the plan.  *See id.*  On appeal, the majority reversed the district court and held that the plaintiff's injuries should not have been excluded under the dismemberment plan's "self-inflicted-wound exclusion," because they were "not highly likely to occur."  *Id.* at 329, 338.  In its analysis, the *Kovach* court distinguished its facts from that of an earlier decision, *Lennon v. Metropolitan Life Ins. Co.*, 504 F.3d 617 (6th Cir. 2007):

> We agree with the *Lennon* lead opinion that driving the wrong way down a one-way street while drunk to the point of semi-consciousness, and at a rate of speed so fast that the vehicle is on the verge of becoming airborne, amounts to a level of recklessness that would render the resulting injuries highly likely, and therefore not accidental.
>
> The facts surrounding Mr. Kovach's crash, however, are nowhere near as dramatic as those in *Lennon*.  Besides driving while intoxicated — at a level less than half that of Lennon — the only other out-of-the-ordinary thing that Mr. Kovach did was run a stop sign, something done with unfortunate frequency by sober drivers.  There is no indication in the record that Mr. Kovach was traveling at an abnormally high rate of speed or driving in an otherwise risky manner.

*Kovach*, 587 F.3d at 331.

As discussed above, considering the extreme level of intoxication while driving a motorcycle at dusk in excess of 124 miles per hour, a reasonable person with background and characteristics similar to the Decedent would have viewed the resulting injury or death as

substantially certain to result from the Decedent's conduct. *See Richardson v. Mut. of Omaha Ins. Co.*, No. 3:06-cv-197, 2007 WL 1577942, *3 (W.D. Ky. May 31, 2007); *Poeppel v. Hartford Life Ins.*, 273 F. Supp. 2d 714, 720 (D.S.C. 2003); *Mullaney v. Aetna U.S. Healthcare*, 103 F. Supp. 2d 486, 494 (D. R.I. 2000).

In *Riddle v. Life Ins. Co. of N.A.*, No. 11-cv-1034, 2011 WL 4809037 (D.N.J. Oct. 11, 2011), the court applied *de novo* review and upheld the denial of benefits in a factually similar situation to the present matter. In *Riddle*, the decedent was driving at night, at an excessive rate of speed — approximately 98 miles an hour in a 45 mile per hour zone. *See id.* at *7. Moreover, the decedent had consumed enough alcohol to give him a blood alcohol level of 0.222%, nearly three times the legal limit. *See id.* Upholding the denial, the court noted that, at the decedent's level of intoxication, at that high rate of speed, the decedent "had little control over his physical or mental faculties." *Id.* Further, the court noted that, as in *Mullaney*, there was no evidence that the decedent "took any evasive action to avoid crashing into the tree which ultimately caused the car wreck." *Id.* "Even were this Court to assume that Mr. Riddle himself may not have intended or foreseen any harm in attempting to drive while grossly intoxicated and at an extremely high rate of speed, a reasonable person would have known that driving while under the influence, very late at night and at highly unsafe speeds would likely result in serious bodily harm or death." *Id.*

As in *Riddle* and *Mullaney*, considering the totality of the circumstances and construing the terms of the Plan in Plaintiff's favor, the Court finds that Defendants are entitled to summary judgment. The circumstances of Decedent's death were so extreme that a reasonable person would have viewed the resulting death as substantially certain to result from the Decedent's conduct. *See Riddle*, 2011 WL 4809037, at *7. Further, as in *Riddle* and *Mullaney*, there was no

evidence that the Decedent took evasive action or even applied his brakes in an attempt to avoid the other vehicle. *See* Dkt. No. 13-10 at 12.

Finally, the Court finds that, contrary to Plaintiff's contentions, Aetna did not apply a *per se* exclusion for driving while intoxicated in determining that the Decedent's death was not an accident under the Policy. Aetna received the autopsy and toxicology reports on February 14, 2013, but it waited until it received the police report on or about July 23, 2013 to make its determination. *See* Dkt. No. 14 at ¶¶ 18, 22. Aetna assessed the totality of the evidence and concluded that, based on the numerous actions taken by the Decedent, including his extreme intoxication while operating a motorcycle at a recklessly high speed, his death occurred as a result of an "intentionally self-inflicted injury."

Based on the foregoing, the Court grants Defendants' motion for summary judgment and denies Plaintiff's cross motion.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 12) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's cross motion for summary judgment (Dkt. No. 18) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 30, 2016
       Albany, New York

Mae A. D'Agostino
U.S. District Judge